Alphonso **TAYLOR, a/k/a Alphonso Townes, Appellant,**

v.

**UNITED STATES, Appellee.**

**Harvey TUCKER, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 81–51, 81–123.**

District of Columbia Court of Appeals.

Argued March 2, 1982.

Decided Oct. 6, 1982.

A. Franklin Burgess, Jr., Public Defender Service, with whom William J. Mertens, Public Defender Service, Washington, D.C., was on brief, for appellant Taylor.

Russell F. Canan, appointed by the court, for appellant Tucker.

Regina C. McGranery, Asst. U.S. Atty. with whom Charles F.C. Ruff, U.S. Atty. at the time the brief was filed, John A. Terry, Asst. U.S. Atty. at the time the case was argued, and Gordon C. Rhea and E. Anne McKinsey, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before KERN, NEBEKER and FERREN, Associate Judges.

NEBEKER, Associate Judge:

■ Following a two and one-half day jury trial, appellants Alphonso Taylor and Harvey Tucker were both convicted of the armed robbery of John and Wanda Albert, D.C.Code 1981, §§ 22–2901, –3202, as well as carrying a pistol without a license. *Id.* § 22–3204. Appellant Taylor was individually convicted of assault with intent to kill while armed. *Id.* §§ 22–501, –3202. The case against Taylor rested on identifications by Wanda Albert and by two police officers who testified that they saw Taylor as he fled the scene of the crime. Taylor was arrested several days after the incident following photo and lineup identifications by the witnesses. The case against Tucker similarly rested on identifications by Wanda Albert and by two police officers who arrested him near the scene and only a few minutes after the crime. On appeal, appellants contend that (1) the identifications of appellant Taylor by two of the investigative detectives were impermissibly suggestive, (2) that the trial court improperly restricted defense counsels' cross-examination of two government witnesses, and (3) that the court abused its discretion when it excluded appellant Taylor's proffer of expert testimony on the asserted unreliability of eyewitness identification.[1] We affirm.

The government adduced the following evidence at trial. On October 11, 1979, John and Wanda Albert drove from Portsmouth, Virginia to Washington, D.C., to visit friends and to purchase marijuana. Prior to leaving Portsmouth, they withdrew several hundred dollars from their savings account which they divided between themselves.[2] Wanda Albert placed approximate-

---

[1.] Appellant Tucker also contends that the trial judge committed reversible error when he denied Tucker's oral motion for recusal. The motion was made prior to trial testimony and alleged that the judge had complained in chambers of Tucker's counsel's conduct. Prior to hearing argument on the oral motion, the trial judge dismissed the parties for lunch recess. When Tucker returned without an affidavit or a witness to testify to the alleged statement, the judge denied the motion. The motion was not renewed. Super.Ct.Civ.R. 63–I requires a motion with an affidavit stating the facts and reasons for the moving party's belief that bias and prejudice exists. An oral motion without affidavit or testimony is not in compliance. *See Brotherhood of Locomotive Firemen v. Bangor & Aroostook R.R.,* 127 U.S.App.D.C. 23, 30, 380 F.2d 570, 577, *cert. denied,* 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967). The motion was denied without error.

[2.] The Alberts sometimes contradicted one another concerning the circumstances surrounding their weekend visit to Washington. John Albert testified that they came to Washington to see friends and to buy a pound of marijuana. Wanda Albert stated that she knew nothing of any purpose to buy marijuana. John Albert stated that he had withdrawn $825 himself from his savings account at the Fidelity Ameri-

ly $600 inside her blouse, $48 in her sock and a few dollars in her purse. John Albert carried about $50 on his person. Having "a couple of hours to kill" when they first arrived in Washington, the Alberts drove to a neighborhood where they "knew some people" and met a friend named "Weanie." The three individuals spoke for a while, drove to Weanie's home, and later walked to a neighborhood store. As they returned to Weanie's home, Taylor and Tucker approached and asked if anyone would like to buy some "bam" (Preludin). The three individuals continued walking without responding as Taylor and Tucker quickly turned and approached them from behind. Taylor pointed a gun at John Albert's head and ordered everyone into a nearby courtyard which was lighted from the street and a parking lot.

Wanda Albert, who was six months pregnant at the time, was told to sit on one of the benches in the courtyard. John Albert stood on her right and Weanie sat on her left. Taylor stood holding the gun about four or five feet directly in front of Wanda Albert while Tucker knelt on one knee about one and one-half feet from Wanda Albert and held a knife to her abdomen. When Taylor demanded money, Wanda Albert gave him money from her sock and change purse. John Albert gave the money he had in his coat pocket to Tucker. When the assailants demanded more money, John Albert remembered that he had $25 in his left pants' pocket. He mentioned the additional money, but as he reached into his pocket Taylor shot him in the chest. Tucker then removed John Albert's money while Taylor walked over to Wanda Albert,

reached into her blouse, and removed the remaining $600, apparently without anyone saying anything further.

The assailants then demanded the Alberts' car keys and ordered John and Wanda Albert to their car. En route to the car one of the assailants dismissed Weanie saying, "We don't need you any more, brother." [3] For unexplained reasons, Taylor and Tucker then exchanged weapons. Both sat in the front seat with Wanda Albert in the middle and John Albert in the rear seat.

Alerted by a report of a shooting, a police scout car arrived as the assailants were attempting to get the Alberts' car started. Noticing the cruiser, both men jumped from the car and fled. Wanda Albert followed Tucker out of the car, pointed at him, and shouted to Sergeant Charles McKoewn that she and her husband had been robbed and her husband shot. McKoewn gave chase. He arrested Tucker shortly thereafter and took him back to the scene of the crime. When Wanda Albert saw him, she exclaimed, "He's the one with the knife." [4] A search revealed $25 stuffed in Tucker's left trouser pocket, and $20 in his wallet. Wanda Albert also gave a positive in-court identification of Tucker.

Meanwhile, Detective Joseph Schwartz and his partner, Detective Michael Fenske, responding to the same report, observed McKoewn pursuing Tucker less than two blocks from the scene of the shooting. Just as the sight of a uniformed officer chasing a suspect caught the detectives' attention, a second man suddenly darted in front of their cruiser. Detective Fenske had to apply the brakes sharply in order to avoid

---

can Savings and Loan before leaving Virginia. Wanda Albert testified that she, not her husband, had withdrawn the money from the Bank of the Commonwealth, and that the money was to cover expenses and was a precaution against car trouble.

**3.** Weanie was not called as a witness during the trial.

**4.** Although Tucker held the knife in the courtyard, he and Taylor exchanged weapons before getting into the car. A .32 caliber revolver with two live rounds and one spent shell was recovered in an alley Tucker was seen running

across. Officer David Widden found the revolver approximately 15 minutes after observing Tucker in the alley. A .32 caliber bullet was removed from under one of John Albert's ribs. However, because the bullet was not removed until several days after the shooting, the government's expert witness could not determine conclusively that the bullet was fired from the gun found in the alley. The bullet had taken on a frosted appearance and some of its markings had been altered due to the bullet's interactions with the chemistry of John Albert's body.

hitting the man. He fell a few inches from the front bumper of the car and something flew from his hand. He looked directly at the detectives for two or three seconds before resuming his flight. Both officers alighted and gave chase. Detective Fenske ran only a short distance before aborting his chase to return to the cruiser. He testified however, that he got a good view of the suspect's face as he lay on the ground beneath the headlights and looked directly up at the car. When Fenske returned to the cruiser, he found a knife near the place where the man fell. Detective Schwartz pursued the man for approximately twenty seconds to a well lighted area. Schwartz saw the fugitive's face several times as he turned to see if the detective was gaining on him. Officer Schwartz aborted the pursuit when he was called back to assist Sergeant McKeown with Tucker who had taken refuge in a nearby building. Neither Detective Schwartz nor Detective Fenske filed a report of the suspect's description. Although no fingerprints were removed from the knife recovered by Detective Fenske, Wanda Albert testified that the knife appeared to be that held by Tucker during the robbery.

In the meantime, John Albert managed to get out of the back seat of the car, but collapsed to the ground. Officers McKeown and Schwartz returned with Tucker before the ambulance arrived, but John Albert was not able to identify him as one of the assailants. John Albert could only say that Tucker's leather coat appeared to be the same as that of one of the robbers. At the trial, John Albert testified that Tucker was standing about ten feet away at the time of the show-up, and that his face was "very vague[ ]." John Albert was never able to positively identify Tucker as one of the assailants.

On the day following the robbery and shooting, Detective Schwartz received an anonymous telephone tip that the gunman was Alphonso Taylor, appellant Tucker's half-brother. Schwartz obtained a photograph of Taylor from the police files and positively identified him as the man who fell in front of the car. Schwartz placed Taylor's photograph in an array which he showed to Wanda Albert that evening. She viewed the photo array three or four times, and each time she stopped at two photographs, those of appellant Taylor and another individual. Finally, Detective Schwartz pointed at Taylor's photo and asked, "What about this photograph?" Wanda Albert responded: "I'm pretty sure it's him. With his hair longer and with that rain hat, it would be him. I'd have to see him in person." On October 23, Wanda Albert attended a lineup at which she identified Taylor within 30 seconds. She also identified him at trial. When shown a photograph of the lineup containing Taylor, John Albert chose the wrong individual. As with Tucker, John Albert was unable to make any positive identification of Taylor.

Detective Fenske was not on duty on the day Schwartz received the telephone tip or the next day, Saturday. Detective Schwartz was off duty the following two days. On Tuesday morning, October 16, Detective Schwartz walked past the desk of Detective Fenske who was talking on the telephone, and dropped a photograph of Taylor in front of Fenske. Schwartz said, "Look at this." Interrupting his conversation, Fenske stated, "That's the person that fell in front of our cruiser, the same guy we chased." Fenske recognized Taylor again when he was arrested the following morning. However, at trial Fenske was unable to make a positive identification of Taylor.[5] The $600 taken from Wanda Albert was never recovered.

5. During direct examination, Detective Fenske testified to his identification of Taylor as follows:

A. I was sitting there talking on the telephone and [Schwartz] dropped a photograph in front of me and said, "Look at this." I looked at it and I realized that that was the subject that had fallen in front of the car.

Q. Was there any doubt in your mind about the man depicted in the photograph?
A. No, sir, there wasn't.
Q. Do you see that man in court today?
A. I'm not sure.

Appellant Taylor asserts error in denial of the suppression motion in that the identifications by Detectives Schwartz and Fenske after viewing only the single photograph of Taylor were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *accord, e.g., Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Sheffield v. United States,* D.C. App., 397 A.2d 963 (1979); *Ellis v. United States,* D.C.App., 395 A.2d 404 (1978); *Graham v. United States,* D.C.App., 377 A.2d 1138 (1977); *Marshall v. United States,* D.C. App., 340 A.2d 805 (1975). In evaluating the likelihood of misidentification, the factors to be considered include (1) the opportunity of the witness to view the criminal during the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Neil v. Biggers, supra* 409 U.S. at 200–01, 93 S.Ct. at 382–83; *Manson v. Brathwaite, supra* 432 U.S. at 114–15, 97 S.Ct. at 2253. Application of these factors to the instant case demonstrates support for the trial judge's conclusion that the identifications were reliable.

The two trained detectives had sufficient opportunity to view Taylor at the scene because he fell and looked at them for two or three seconds just a few inches from the front bumper in the glare of the headlights. *See Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). In addition, the attention of each detective was focused directly on the man lying in front of their vehicle because of the near-collision. Those are significant factors in assessing their opportunity to observe the suspect. *Manson v. Brathwaite, supra; United States v. Kilgore,* 418 F.2d 225 (9th Cir. 1969). Detective Schwartz saw the suspect's face several additional times during the subsequent pursuit to a nearby well lighted area. Although neither officer gave a description of the fugitive, Schwartz saw Taylor's photograph only twelve hours after the chase and recognized him as the man who stumbled in front of the cruiser. Five days later, Schwartz saw Detective Fenske for the first time since the incident, and dropped Taylor's photograph on Fenske's desk without indicating the context of the picture. Fenske spontaneously stated that the photo was that of the man they had chased. The trial judge noted that Fenske's identification was prompted solely by his memory of the person whose face flashed before the headlights.[6] The evidence clearly supports a holding that the identifications were reliable. The trial court allowed them to go to the jury without error.[7]

Appellants raise two issues concerning the trial court's restriction of their cross-examinations of government witnesses concerning their bias or motivation to lie. First, appellant Taylor argues that Detective Schwartz engineered and manipulated the identifications by Detective Fenske and Wanda Albert and that Schwartz should have been cross-examined about his motivation to buttress the government's case. Second, both appellants contend that Wanda Albert lied in order to protect her husband's job as a police informant.

The "extent of the cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). "[B]ias is always a

---

6. The trial judge stated as to Detective Fenske: "[I]t was five days after and these people were working on many other cases. [T]he photo is put in front of him, no suggestion as to what case, what photo, and the man makes an instant recognition of it." He made no express ruling as to Schwartz, but the motion to suppress stood as denied to him also.

7. Because the identifications by Detective Schwartz and Fenske were otherwise admissible, this court need not address the issue raised by appellants that the detectives were required to view the photo arrays as any other "witness" to a crime.

proper subject of cross-examination," *Hyman v. United States,* D.C.App., 342 A.2d 43, 44 (1975), and may assume significance in certain circumstances.

"For example, bias cross-examination directed to a key witness may be extremely important to the jury's determination of guilt or innocence, especially where one who is a key government witness is also a professional informant .... Such cross-examination is also of significant import where a witness' testimony establishes 'a required element of the charged offense' or goes to 'the heart of the defense at trial,' or has little independent corroboration." [*Springer v. United States,* D.C. App., 388 A.2d 846, 855 (1978) (citations omitted).]

When reviewing claims of restriction of cross-examination, "the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial." *Springer, supra* at 856.

Where the record reflects a curtailment of a requested line of bias cross-examination *in limine,* so that the jury is unable properly to perform its factfinding function in inferring bias from the testimony as a whole, we will assess cross-examination errors by a per se error standard. If, however, the trial court has permitted some cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this court will evaluate error by application of the harmless constitutional error test of *Chapman v. California* [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]. To hold harmless such error in curtailing constitutionally-protected cross-examination, it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony. [*Springer, supra* 388 A.2d at 856 (citations and footnote omitted).]

■ Appellant Taylor first contends that the trial court abused its discretion when it limited his cross-examination of Detective Schwartz. The questioning disallowed by the court concerned a police regulation which requires photo arrays of at least eight pictures for identifications by witnesses. Metropolitan Police General Order No. 304.7 (revised Nov. 25, 1974). Taylor argues that the questioning was necessary to demonstrate Detective Schwartz's motivation to lie. Specifically, appellant states that Schwartz neglected to follow the correct police procedures when he viewed, and showed to Detective Fenske, only a single photograph of Taylor. For that reason, appellant contends, Schwartz colored his testimony to buttress the government's case, protect his own job, and advance his career.

A review of the record reveals, however, that there was sufficient evidence buttressed by argued inference for the jury to infer bias, if it chose to do so. Detective Schwartz candidly stated to the jury that he viewed, and showed to Fenske, only the single photograph of Taylor. In addition, defense counsel stated in the presence of the jury that Schwartz had not followed proper police procedures when he failed to use arrays for his own identification and that of Fenske. Counsel also suggested during her closing argument that Detective Schwartz was committed to the theory that Taylor was the gunman because Schwartz knew Taylor was Tucker's brother. Counsel stated that Schwartz looked at Taylor's photograph alone to provide an "easy answer" to the investigation, and showed only the single photo to Fenske in order to marshal evidence against Taylor. Appellant's counsel further suggested to the jury that Schwartz impermissibly suggested Taylor's photograph when he showed the array to Wanda Albert and stated, "What about this photograph," as she paused over Taylor's picture. Even without the cross-examination, appellant was able to advance the theory that Detective Schwartz was biased. *Compare Coligan v. United States,* D.C. App., 434 A.2d 483 (1981). Under these

circumstances, reversal is not warranted. *Springer v. United States, supra.*

A second and more complex issue of excessive restriction of cross-examination is raised by both appellants. They argue that the trial court erred when it limited their cross-examination of John Albert. Appellants based their defense on misidentification and argued that there was no robbery. Rather, the defense sought to prove that the Alberts came to Washington to sell, not buy, drugs, and that John Albert was shot during a drug transaction. The theory of the defense was that John Albert was shot possibly because he was a known informant for the Drug Enforcement Administration (hereinafter DEA), and that Wanda Albert, who was the only witness who positively identified appellants as the assailants, lied in order to curry the favor of the DEA, to conceal the illegal activity, and to protect John Albert's job as a DEA informant. However, appellants defense needed testimony that statements concerning John Albert's illicit activity would jeopardize his job as a DEA informant.

Prior to trial, the prosecutor proffered to the court that John Albert had worked occasionally for the DEA, that he was not an employee either at the time of the offense or at the time of trial, and that his visit to Washington had been wholly unrelated to that employment. The prosecutor then asked that cross-examination of John Albert concerning his employment be limited to whether any of his money came from DEA. The trial court ruled that the defense could question John Albert about where he got his money, but that it could not ask him about the extent of his involvement with DEA. The court determined that the probative value of a more detailed cross-examination would not outweigh its possible prejudicial effect on the Alberts. However, when asked about how he obtained the money taken during the robbery, John Albert testified that he had earned it selling automobiles and denied any other source of income. The jury was then advised by the prosecutor that "for about a year to October 11, 1979, John Albert occasionally acted as a paid informant for the Drug Enforcement Administration on a part-time basis. He was not on an assignment on October 11, 1979." Counsel for the defense agreed to the stipulation in lieu of further cross-examination to correct John Albert's prior testimony. However, appellants argue on appeal that the trial court's pretrial order limiting their cross-examination of John Albert was an abuse of discretion. They claim that they needed to question him about the nature of his work, his contacts within the agency, whether he had on-going cases for which he had not been paid, or whether he had discussed with his superiors the implications of criminal activities outside the scope of his own employment. Such an examination, appellants contend, was necessary in order to "make a record from which to argue *why* [Wanda Albert] might have been biased or otherwise lack that degree of impartiality expected of a witness at trial." *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (emphasis in original). Appellants argue that since the court cut off cross-examination *in limine,* without permitting even some cross-examination to establish a sufficient basis for the jury to infer a motive to lie, the error was harmful *per se.*

The trial court in this case did not cut off cross-examination *in limine.* It only disallowed examination of the extent of John Albert's involvement with DEA. *Compare Coligan v. United States,* D.C.App., 434 A.2d 483 (1981); *Gillespie v. United States,* D.C.App., 368 A.2d 1136 (1977). Therefore, this court's view must focus on whether it is clear beyond a reasonable doubt that the restricted line of inquiry would have weakened the impact of Wanda Albert's testimony. *Springer, supra* 388 A.2d at 856. Because Wanda Albert was a key government witness whose largely uncorroborated testimony established one or more elements of the charge and John Albert was a professional informant, appellants' attenuated claim of a community of interest on the part of the Alberts must be examined. *Coligan, supra* 434 A.2d at 485; *Springer, supra* 388 A.2d at 857.

Wanda Albert testified that the robbery and shooting took place in a well lighted area, and that the assailants were both within five feet of her. She quickly identified Tucker at the scene following his arrest. Although she hesitated while picking Taylor's picture out of the photo array, she selected him within 30 seconds at the lineup. Wanda Albert identified both men at the trial. Furthermore, appellants were able to argue the existence of bias on the part of the Alberts through the very fact of John Albert's DEA employment. Both counsel assailed John Albert's character, stressed that he lied on the stand, and argued before the jury of his bias. In his opening statement counsel for appellant Tucker stated that "John Albert is what they call on the street, a snitch, an informant, that he worked in fact for the Drug Enforcement Agency ...." Then counsel for appellant Taylor stated:

> You're going to hear about John Albert, that he was once working for the Drug Enforcement Administration; that it was in his interest to cooperate with the Government because snitches get money, and he was a snitch for a living. He was a snitch before he came up here and when he came up here.

During the course of closing argument, counsel for appellant Tucker argued repeatedly and strenuously that the government's case should be discounted because of the character of John Albert:

> And then we have the sight of John Albert, and, yes, he kind of looks respectable now, but let's think what he really is—a paid informant for DEA, Government Enforcement Agency, who gets paid money to make cases for the Government, using that money to buy and sell drugs, using Government money probably to buy and sell drugs for which he then probably informs on the people he bought from. Isn't that comical.
>
> [John Albert] is a drug user; [8] a DEA informant, drug abuser, and we submit, a drug seller, a dope pusher ....

[He] lied on the stand. ...

> If you believe that man, if you think everything he says is telling the truth, you go ahead and convict Harvey Tucker.

\*   \*   \*   \*   \*   \*

> [The Alberts] came to sell drugs, because they had some drugs. He knows the drug scene, he's a former heroin addict, a DEA informant. He came here to sell drugs and he was doing that.
>
> Two things probably happened. One, they sold bad dope, so this is not robbery. This is revenge. Or, two, he was recognized for what he is, a snitch, so this is not robbery. This is betrayal.

It is clear beyond a reasonable doubt that appellants were not prejudiced. They were able to advance all of their argument to the jury, and their ultimate defense was fully aired. The restricted line of inquiry into the extent of John Albert's involvement with DEA would not have weakened the impact of Wanda Albert's testimony. The trial court did not abuse its discretion when it limited the cross-examination of John Albert. *Brown v. United States,* D.C.App., 409 A.2d 1093, 1101 (1979).

■ Appellant Taylor finally contends that the trial court abused its discretion in excluding proffered expert testimony "on the subject of the nature of human memory and perception and mental processes involved in an eyewitness identification." It is well established that the decision whether expert evidence should be admitted is vested in the broad discretion of the trial court, and that its ruling will be sustained unless manifestly erroneous. *See Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1121, 8 L.Ed.2d 313 (1962); *Middleton v. United States,* D.C.App., 401 A.2d 109, 131 (1979); *Douglas v. United States,* D.C. App., 386 A.2d 289, 295 (1978); *Dyas v. United States,* D.C.App., 376 A.2d 827, 831, *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).

---

**8.** John Albert testified that he had been addicted to heroin until 1976 and was enrolled in a methadone maintenance program. He stated that he had received methadone on the day he drove to Washington.

In *Dyas* the court set forth three qualifications for the admissibility of expert testimony:

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman* ..."; (2) "the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth* ..."; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." 376 A.2d at 832, quoting from McCormick, Evidence § 13 (2d ed. 1972) (emphasis in original).

The issue raised by appellant Taylor is indistinguishable in any meaningful respect from the issue addressed in *Dyas*.[9] The subject matter of the proffered testimony related to the capacity of witnesses to observe, recognize and remember, occurrences within the common experience and understanding of every juror. All the trial witnesses were subjected to extensive cross-examination regarding their ability to observe appellants and the subsequent procedures by which identifications were made. Appellant Taylor's counsel forcefully argued in her summation that the witnesses were wrong when they identified appellant, focusing at length on the limitations on each witness' capacity to observe, and the possible suggestivity of the identification procedures employed. There is no reason to believe that the jurors were incapable of properly evaluating the evidence by using their experience and common sense, in lieu of expert elucidation. The trial court correctly ruled that the subject matter was not beyond the ken of the jury.

9. Specifically, the expert witness' proffered testimony would have explained the "three-step process" that psychologists "agree" is involved in eyewitness identification. He would have testified that "scientific literature" supports the conclusion that one under stress does not make

Accordingly, the convictions of appellants Taylor and Tucker are

*Affirmed.*

FERREN, J., concurs in the result only.

as good an observation as one not under stress, that once a person publicly announces an opinion he will be motivated to maintain it despite the existence of subsequent, contrary evidence, and that identifications in crimes involving weapons have reduced reliability.