**Harold L. BEYNUM, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 82–1588.**

District of Columbia Court of Appeals.

Argued Dec. 13, 1983.

Decided July 30, 1984.

---

Scott Howe, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the brief was filed, James Klein, Public Defender Service, and Mark S. Carlin, Public Defender Service, Washington, D.C., were on the briefs, for appellant.

Bruce A. Peterson, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before PRYOR and BELSON, Associate Judges, and KERN, Associate Judge, Retired.[*]

PRYOR, Associate Judge:

Appellant Harold L. Beynum was convicted by a jury of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1981); two counts of armed robbery, *id.* §§ 22–2901, –3202; felony murder while armed, *id.* §§ 22–2401, –3202; two counts of assault with intent to commit robbery while armed, *id.* §§ 22–501, –3202; assaulting a police officer, *id.* § 22–505(a); and carrying a pistol without a license, *id.* § 22–3204. We vacate one conviction of armed robbery, upon which appellant received no sentence, because it merged into the felony murder conviction. *Leasure v. United States*, 458 A.2d 726, 730–31 (D.C.

[*] Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

1983); *see Harling v. United States*, 460 A.2d 571, 574 (D.C.1983). We otherwise affirm.

## I

Two incidents which occurred on May 30, 1981, gave rise to the charges against appellant.

### A.

James Stamateris arrived in the District on May 30, 1981, to commence naval service. At about 6:00 p.m., he parked in the underground garage of the Skyline Inn, at South Capitol and I Streets, S.W., and registered. Returning to his car for his bags, he noticed a man with "droopy eyes" walking nearby. The garage was well lighted. Stamateris continued to observe the stranger as he opened his car.

As Stamateris gathered some of his clothes, the stranger approached. Stamateris turned to face him. The man "screwed up" his face and pulled the trigger of a pistol that he pointed at Stamateris. Surprisingly, the weapon did not fire, and Stamateris attempted to wrestle the gun from his assailant. Unsuccessful, Stamateris broke away and fled into the garage. He later left the garage and telephoned police.

Stamateris picked appellant's photograph from an array, later identified him in a lineup, and ultimately identified him in court as the assailant.

### B.

On May 30, Swiss citizens Gertrud Eggiman, Irene Banninger, and Katherina Murri were also staying, as part of a tour group, at the Skyline Inn. At Eggiman's suggestion, the three elderly ladies went for a walk at 9:00 p.m. A gunman confronted them and grabbed Eggiman's purse; when she resisted, the gunman shot her and fled with the purse. Eggiman died at the scene.

At police headquarters, Banninger and Murri were asked to review several arrays, which did not include appellant's photograph. The witnesses failed to make an identification. Several months later, the witnesses picked appellant's photograph from another array.[1]

Lucho Young, a passing motorist, saw Eggiman fall to the street as a man fled with her purse. Young pursued, but was unable to continue in his car after the man ran into a dead end alley.[2] Young identified police photographs of appellant and his brother, Steven, as resembling Eggiman's killer. He concluded that Steven Beynum was the assailant. Steven Beynum was arrested, but was released shortly afterward on the basis of an alibi.

Steven led police to appellant, however, who was at his girlfriend's house. Appellant escaped through a back door. A subsequent chase culminated in appellant being shot and arrested by Metropolitan Police Officer Irving Cousins. Lucho Young, realizing that his previous identification of Steven Beynum was erroneous, identified appellant at a lineup.

### C.

At trial, the government presented eyewitness testimony as well as the testimony of appellant's mother, Betty Beynum. Mrs. Beynum told the jury that on the night of the offenses she was at home. At about 9:30 or 10:00 p.m., appellant, who was out of breath and looked "strange," entered the house and spoke with his brother, Kevin. Mrs. Beynum did not hear the

1. The trial testimony of each witness was equivocal, however. Banninger stated that she had selected appellant's photograph because she recognized his distinctive eyes. She was not certain, however, that he was the killer. In Murri's deposition, which was videotaped and shown to the jury, she stated that she was not "one hundred percent" certain that appellant was the killer.

2. The police found Eggiman's purse at the end of this alley. The victim's wallet and some identification papers were also discovered in the vicinity.

conversation, but she saw appellant put on Kevin's hat and coat. She recalled Kevin later telling her that appellant had shot someone.[3]

Johnny Butler, godfather to Steven and Kevin Beynum, saw appellant on the night of the shooting at a convenience store at 25 M Street, S.E.[4] Appellant appeared more "fidgety" than usual, and told Butler that he had done "something stupid and dumb tonight."

Appellant presented an alibi defense. Linda Whyten, the mother of appellant's son, told the jury that appellant came to her home at 8:00 p.m. on May 30, watched television the entire evening, and remained until the next morning.

## II

Appellant first challenges the government's presentation of allegedly prejudicial "other crimes" evidence through Steven Beynum's testimony. Steven told the jury that he attempted to convince appellant to surrender to police. To accomplish this, Steven reminded appellant that Kevin Beynum had already learned from appellant himself that he had shot a woman on May 30. Upon hearing this, appellant began to argue with Steven as to what Kevin had heard. Steven recalled appellant telling him that Kevin and Mrs. Beynum had heard

> something different ... he was mainly trying to tell me that he didn't tell them that ... *he told them that he had shot somebody somewhere else.* [Emphasis added.]

■ Appellant immediately moved for a mistrial, claiming that the italicized statement was irrelevant and prejudicial evidence of another crime. The prosecutor

countered that appellant's admission was effectively one of guilt in the instant matter, and therefore admissible. Declining to call a mistrial, the court struck the comment and instructed the jury to disregard it.[5] We hold that further action was not required.

The "long standing" rule of law is that evidence of other crimes is inadmissible to show a defendant's bad character or criminal disposition as a shortcut to proving guilt. *E.g., Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983); *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). The likelihood is high that the jury will misuse evidence of other crimes, *Drew v. United States,* 118 U.S. App.D.C. 11, 15, 331 F.2d 85, 89 (1964), so such evidence is presumed unduly prejudicial—inadmissible—unless introduced for a legitimate narrow purpose. *Willcher v. United States,* 408 A.2d 67, 75 (D.C.1979).

We are unpersuaded that a *Drew* analysis is appropriate here. In *Staton v. United States,* 466 A.2d 1245 (D.C.1983), police investigation of a rape led to appellant's arrest. After first giving police an exculpatory statement, appellant admitted raping a woman, not the complainant, at a different location (but in the same vicinity) and at the same time as the rape charged. *Id.* at 1248. Staton appealed his conviction, challenging the ruling that his rape confession was admissible. We held that a *Drew* analysis was unnecessary to affirm:

> Despite discrepancies between the victim's hair style, attire, and the location of the assailant's first contact with the victim, we are satisfied that the trial court had ample grounds for concluding, as it did by unmistakable implication, that ap-

---

**3.** Kevin Beynum also testified that appellant had confessed to the shooting.

**4.** The clear thrust of Butler's testimony was that he saw appellant on the night of Eggiman's murder. The witness stated at various times during his testimony, however, that he had seen appellant on the night of May 30 or 31. The prosecutor may have engendered the witness'

confusion by asking if appellant was seen on "Saturday, May 31, 1981." The date actually fell on a Sunday; the shooting occurred on Saturday, May 30. Evidence supplied by other witnesses established the date and time of the shooting.

**5.** At trial's end, the court again so instructed the jury.

pellant's confession related to the charged offense. It follows that the confession was both relevant and admissible, and reference to the *Drew* criteria was unnecessary.

*Id.* at 1250.

In the circumstances of the instant case, as in *Staton,* traditional "other crimes" analysis is not required because the challenged testimony was specifically directed to appellant's involvement in the instant offense. It simply did not purport to bear upon his character or general disposition.[6] Appellant's protestation, related by Steven Beynum, was nothing more than his hastily-conceived attempt to deny knowledge of or complicity in the Eggiman murder.[7] It is clear from the record that the government did not attempt to prove appellant's commission of another asserted murder. There was, accordingly, no error in the court's resolution of the matter.

### III

#### A.

Appellant next claims that a mistrial was required because the government called an alibi rebuttal witness without first disclosing its intention to do so. Pursuant to Super.Ct.Crim.R. 12.1(b), if the government requests defense counsel's notice that an alibi defense will be presented, the prosecutor must return in timely fashion

> a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut

testimony of any of the defendant's alibi witnesses.

*Id.*[8]

In this case, the government did ask appellant to disclose any intent to raise an alibi defense, and to list the witnesses expected to support the alibi. The government request stated that Eggiman was murdered at approximately 9:20 p.m. on May 30th, in the 900 block of Half Street, S.W.[9] Appellant responded that, at the time specified, he was at the home of Linda Whyten. Appellant represented that Whyten would so testify. In his response, appellant sought a list of government witnesses who could place appellant at the crime scene, or rebut this alibi. A list was subsequently sent to appellant.

The prosecutor's opening statement indicated that he would call a witness who saw appellant on the night of the murder, near the scene. Appellant objected immediately, claiming that he had not received prior notice that such a witness was available. The trial court reserved its ruling on the question. When the government later called Johnny Butler, during its case-in-chief, appellant renewed his objection. He asserted that the prosecutor knew the details of Whyten's forthcoming alibi testimony, and also knew that Butler's testimony would contradict the alibi. The prosecutor responded that the alibi's details had not been disclosed, and that Butler would not place appellant at the crime scene at the time of the offense. The trial court allowed Butler to testify, ruling that Butler was not an alibi rebuttal witness under Rule 12.1.

Butler testified that he had seen and spoken to appellant, who appeared unusual-

---

6. *Cf. Lee v. United States,* 471 A.2d 683, 686 (D.C.1984) (per curiam) (*Drew* inapplicable when other crimes evidence "inextricably entwined" with evidence relevant to accused's guilt) (citing *Smith v. United States,* 312 A.2d 781, 785 (D.C.1973)).

7. This was Steven Beynum's view, expressed during his cross-examination.

8. The Supreme Court has ruled that due process requires some form of reciprocal discovery by

the defendant of the government's alibi rebuttal evidence. *Wardius v. Oregon,* 412 U.S. 470, 474–76, 93 S.Ct. 2208, 2211–13, 37 L.Ed.2d 82 (1973); *see Smith v. United States,* 325 A.2d 180, 183 (D.C.1974).

9. Appellant also was informed that the Stamateris incident occurred at 6:00 p.m. on May 30th, at 10 I Street, S.W.

ly nervous, between 10:00 and 10:15 p.m. on the night of the murder, several blocks from the scene. Appellant, according to the witness, said that he had done "something stupid and dumb tonight." Whyten, as recounted, later testified that appellant was with her that entire night. Although the prosecutor mentioned this inconsistency during closing argument, the trial court again denied appellant's motion for mistrial.

Our question is whether the government's failure to disclose its intention to call Butler was error under Rule 12.1, warranting a new trial, on the ground that Butler's testimony served to rebut appellant's alibi. The facts of this case make the question close, but we answer it in the negative and therefore decline to reverse the trial court's ruling.

### B.

Rebuttal evidence refutes, contradicts, impeaches, or disproves an adversary's evidence. *E.g., United States v. Hall*, 653 F.2d 1002, 1006 (5th Cir.1981); *United States v. Papia*, 560 F.2d 827, 848 (7th Cir.1977); *State v. Olsen*, 103 Idaho 278, 281, 647 P.2d 734, 737 (1982); *Britton v. State*, 414 So.2d 638, 639 (Fla.Dist.Ct.App. 1982); *People v. Bush*, 103 Ill.App.3d 5, 14, 58 Ill.Dec. 482, 489, 430 N.E.2d 514, 521 (1981); *People v. Wright*, 74 Mich.App. 297, 300, 253 N.W.2d 739, 740 (1977). Appellant

urges a standard under which the "alibi rebuttal" label is attached to any witness whose testimony undercuts the alibi. The simplicity of this position is beguiling, for such a rule would give the trial court scant guidance if the alleged rebuttal witness testified during the government's case-in-chief, before the complete details of the alibi were known.[10] In such circumstances, the trial court may be hard pressed to speculate as to the function of the government witness' testimony; specifically, it may not be able to determine whether the witness will actually rebut the alibi yet to be presented.

This case presents an apt illustration. When Butler was called to testify, nothing in the record indicated that appellant's alibi would be more than the assertion that he was with Whyten *when Eggiman was killed.*[11] *Accord* Criminal Jury Instructions for the District of Columbia, No. 5.02 (3d ed. 1978) (alibi defense when accused claims that he "was not present at the time when, and the place where, this offense was allegedly committed"). Butler's testimony was not expected to touch upon this time, nor would it place appellant at the crime scene. At this juncture, then, the decision permitting Butler to testify was not inappropriate.[12]

 Although Whyten's story contradicted Butler's testimony, it was only after

---

**10.** Implicit in our analysis is a rejection of the government's position that Rule 12.1 applies only to government witnesses called during the rebuttal phase of trial. The federal alibi notice rule, which is identical to our own, *Clark v. United States,* 396 A.2d 997, 999 n. 4 (D.C.1979), has been assumed to apply to government case-in-chief witnesses called to counter the anticipated defense. *See McClendon v. United States,* 587 F.2d 384, 387–88 (8th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1793, 60 L.Ed.2d 244 (1979); *United States v. Floyd,* 555 F.2d 45, 46, 48 n. 7 (2d Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977). *Cf. United States v. Evans,* 697 F.2d 240, 248 n. 8 (8th Cir.) (government may present rebuttal evidence prior to defense case), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). "Alibi rebuttal" is a functional characterization, one which may apply in a particular case to witness-

es presented either during the case-in-chief or rebuttal phases of trial.

**11.** Similarly, there is no record support for appellant's charge that the prosecutor knew, before trial, the precise details of Whyten's testimony. The alibi notice and appellant's opening statement disclosed only that Whyten would place appellant away from the crime scene at the time Eggiman was shot. Proof that the prosecutor had prior knowledge would, of course, put our resolution of this matter on a different footing. *See infra* pp. 704–705.

**12.** We note that appellant did not seek to inform the trial court, prior to Butler's testimony, of the details that Whyten would subsequently relate. Such notice may have led the trial court to a different conclusion as to the propriety of Butler's nondisclosure under Rule 12.1.

the details of her story emerged that it appeared in retrospect that Butler had "rebutted" the alibi. It is in this context, then, that the standard urged by appellant appears ill-suited to the realities of trial. Applying Rule 12.1 to a government witness whose testimony counters that *later* offered by alibi witnesses, regardless of whether the countered details of the alibi were earlier revealed, offers a defendant undue leeway to selectively invoke the rule simply by choosing to elicit a more detailed version of the alibi than that revealed earlier. Requiring exclusion or mistrial, moreover, would create a real incentive for the accused to withhold portions of the alibi until the last possible moment. This is untenable. Accordingly, in order to avoid prejudicial surprise to either party,[13] we hold that Rule 12.1 requires the government to list witnesses testifying in the case-in-chief or rebuttal, if their testimony is offered for the purpose, or has the pri-

mary effect,[14] of countering the operative facts of the alibi set forth either in the defendant's pretrial notice, or as otherwise known by the prosecutor. Given the order of disclosure in this case, the court was not required to strike Butler's testimony or grant a mistrial.[15]

## IV

Instead of surrendering, appellant ran from his girlfriend's apartment. At first, appellant eluded police, but soon he found himself facing Officer Irving Cousins. Cousins was in uniform at the time.

Cousins testified that he yelled "halt, police" as appellant approached. The officer drew his service revolver, but appellant "lunged" at him. Cousins, fearful that appellant might grab the weapon, shot him once, and then twice more when appellant did not stop.[16] Appellant was charged with

**13.** Avoiding prejudicial surprise is one of the purposes served by the alibi notice rule. *United States v. Myers*, 550 F.2d 1036, 1042–43 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *see generally* H.R. Rep. No. 247, 94th Cong., 1st Sess. 8, *reprinted in* 1975 U.S.Code Cong. & Ad.News 674, 681; 8 Moore's Federal Practice ¶ 12.1.02[1][a] (2d ed. 1983) (cases cited). The government claimed at trial, and appellant did not dispute, that appellant not only learned as early as opening statements that Butler would testify, and received his statements under the Jencks Act, but also interviewed Butler before trial and knew the essence of his testimony. In short, the government argues that even if Butler's name should have been disclosed under Rule 12.1, the failure to do so was harmless. *See Shambley v. United States*, 391 A.2d 264, 266 (D.C.1978); *see also United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir.1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *McClendon v. United States, supra* note 10, 587 F.2d at 388–89; *United States v. Floyd, supra* note 10, 555 F.2d at 48 n. 7. Since we find that Butler's name need not have been disclosed, we do not address this issue.

**14.** *United States v. Myers, supra* note 13, 550 F.2d at 1041, required the disclosure of a witness "concededly introduced for the purpose of" rebutting the alibi. In *Smith v. United States, supra* note 8, 325 A.2d at 182, we held that due process required the disclosure of government witnesses whose "primary effect ... was to re-

but the alibi witness' credibility respecting appellant's whereabouts...." These cases evince recognition that rebuttal witnesses may be so characterized even though the witnesses do not place the accused at the crime scene at the precise time of the offense.

**15.** We note that Butler's testimony served two functions. First, recalling appellant's demeanor and admission on the night of the murder served as circumstantial evidence of guilt. Second, when viewed in light of the subsequently-proffered alibi, Butler's testimony served a rebuttal function. The "hybrid" nature of Butler's testimony buttresses the trial court's decisions— throughout the trial—not to strike it from the record.

Finally, since we have ruled that it was not error for the government to withhold Butler's name prior to his testimony, we can only conclude that *the whole* of his testimony was properly in evidence at the trial's end. Hence, it was not improper for the prosecutor to highlight for the jury the fact that Butler's testimony contradicted the alibi offered by Whyten. This is not to say, however, that the trial court—in its discretion—would have been precluded from instructing the prosecutor prior to his closing arguments to avoid references to the rebuttal nature of Butler's testimony.

**16.** Forensic evidence showed that appellant was shot once in the back. Cousins testified that this could have resulted from the initial shot spinning appellant around.

assaulting a police officer, and was convicted solely upon Cousins' testimony.

Cousins was placed on routine administrative leave after the shooting, and was under investigation. Also, appellant had filed a federal civil suit against Cousins, alleging tortious use of excessive force. Defense counsel attempted to show through cross-examination that Cousins had a personal interest in the outcome of the case and that, therefore, he was a biased witness. When the prosecutor objected, a bench conference ensued:

> [DEFENSE COUNSEL]: The Court sustained an objection with respect to my question about the internal police department investigation when a police officer fires his revolver. We would submit, Your Honor, that that goes to bias and to a desire on the part of the person who shoots the revolver to have a justification ... because it goes to his future employability in the police department ....
>
> \* \* \* \* \* \*
>
> What I want to do is ... ask questions into the fact that [Officer Cousins] knows such an investigation goes on, and, in fact, it took place here, and he knows that he has to justify his actions in shooting the revolver, otherwise his job is in jeopardy.
>
> \* \* \* \* \* \*
>
> THE COURT: You can ask him does he know the [police] regulations. You can ask him those regulations, but you can't ask him did he give that statement to keep from losing his job.

Defense counsel then approached the witness:

> [DEFENSE COUNSEL]:
>
> Q. It's a fact, isn't it, there are police department regulations giving special circumstances under which you are permitted to fire a police revolver, isn't that correct?
>
> A. [By Officer Cousins]: It's police guidelines.
>
> Q. Using the police revolver in a way that doesn't meet those regulations will

get you into trouble on your job, won't it?

> A. Of course.
>
> Q. Once you have shot your police revolver in this case, you knew that you were going to be questioned by police department officials about whether you had complied with those regulations, is that right?
>
> A. Well, I pulled my gun out—
>
> THE COURT: Answer yes or no.
>
> THE WITNESS: I wasn't thinking about that at the time. I was thinking about staying alive.
>
> [DEFENSE COUNSEL]:
>
> Q. But after you had shot your revolver, you knew that that was going to happen, didn't you?
>
> A. I knew that before I pulled it out of the holster.

After further discussion at the bench, the court disallowed cross-examination pertaining to the federal civil suit. Appellant contends that the court's rulings warrant reversal of his assault conviction.

 The right to cross-examine adverse witnesses is imbedded in the Sixth Amendment's confrontation clause. *Davis v. Alaska*, 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Benjamin v. United States*, 453 A.2d 810, 811 (D.C.1982); *Coligan v. United States*, 434 A.2d 483, 485 (D.C.1981); *see Gillespie v. United States*, 368 A.2d 1136, 1137–38 (D.C.1977). The right is not without limit, however. Once "[s]ome meaningful degree of cross-examination" is afforded, *Springer v. United States*, 388 A.2d 846, 854 (D.C.1978), the trial court has the responsibility to "maintain orderly, expeditious and relevant presentation of the evidence to the trier of fact." *Letsinger v. United States*, 402 A.2d 411, 415 (D.C.1979) (citing cases); *see also Rogers v. United States*, 419 A.2d 977, 980 (D.C.1980). We may reverse the trial court's rulings only upon finding an abuse of discretion, *see Springer v. United States, supra*, 388 A.2d at 856, determined

"in light of the specific circumstances presented by each case." *Id.* at 854.

> [T]he standard of review ... will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial.

*Id.* at 856. However, the government may argue that any abuse of discretion was harmless beyond a reasonable doubt; *i.e.,* it is clear that (1) the defendant would have been convicted without the witness' testimony, or (2) the restricted line of inquiry—if permitted—would not have weakened the impact of the witness' testimony. *Id.; see, e.g., Taylor v. United States,* 451 A.2d 859, 865 (D.C.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983).[17]

■ Eliciting bias testimony is an important function of cross-examination particularly "when, as here, the credibility of a key government witness is the central issue." *Benjamin v. United States, supra,* 453 A.2d at 811. In this case, the trial court did not commit reversible error in restricting the scope of Cousins' cross-examination. The jury was aware of sufficient facts, and heard sufficient testimony, from which it could infer (and from which defense counsel could argue) bias. *See Taylor v. United States, supra,* 451 A.2d at 866; *Tabron v. United States, supra* note 17, 444 A.2d at 944; *Hyman v. United*

States, 342 A.2d 43, 44 (D.C.1975) (per curiam). We are convinced beyond a reasonable doubt that additional cross-examination along the lines sought by defense counsel would not have had an impact upon Cousins' testimony.[18]

Defense counsel was able to establish that police guidelines regulated the use of weapons, and that Cousins knew the rules before firing his service revolver.[19] Cousins also told the jury that violation of the rules could lead to adverse employment consequences, pursuant to which he would be questioned by the Department about his conduct. This testimony, viewed along with the questionable circumstances of the shooting itself,[20] alerted the jury to the acute possibility that Cousins might seek to "slant his testimony in favor of the government" in order to defend his actions. *Sherer v. United States,* 470 A.2d 732, 737 (D.C.1983).

■ Defense counsel sought to question Cousins more specifically regarding his administrative suspension and the investigation then pending. Since suspension and investigation are routine in cases such as this, however, we find it clear beyond a reasonable doubt that such testimony would not have damaged Cousins' credibility.

■ We conclude that foreclosing questioning about the civil suit—if assumed to be an abuse of discretion—similarly was harmless beyond a reasonable doubt.[21] Of

---

17. Our reading of the transcript confirms that cross-examination of Cousins, going to bias, was not cut off *in limine.* That one possible source of bias—the civil suit—was not revealed to the jury, does not require an *in limine* finding. *See Taylor v. United States, supra,* 451 A.2d at 865; *Tabron v. United States,* 444 A.2d 942, 944 (D.C. 1982). Any error we address, therefore, is not conclusively presumed harmful. *Springer v. United States, supra,* 388 A.2d at 856; *see, e.g., Washington v. United States,* 461 A.2d 1037, 1038 (D.C.1983).

18. The record is sufficiently clear, we find, to enable us to base our decision of harmlessness upon the second test set forth in *Springer v. United States, supra. See Tabron v. United States, supra* note 17, 444 A.2d at 944.

19. The court had allowed defense counsel to ask Cousins what the regulations required. Defense counsel evidently chose not to pursue the matter during cross-examination of the witness.

20. *See supra* note 16.

21. The government concedes that the trial court erred by preventing cross-examination about the civil suit. We do not decide the question since we conclude that even if there was error, it was harmless. *Cf. Sullivan v. United States,* 404 A.2d 153, 160–61 (D.C.1979) (harmless error to prevent jury from hearing complaining witness testify about intentions to bring civil suit against defendant); *United States v. Gambler,* 213 U.S.App.D.C. 278, 281–86, 662 F.2d 834,

the potential sources of bias, employment trouble afforded Cousins a more serious and immediate motive to falsify than did appellant's mere filing of the civil suit. The civil suit represented nothing more than appellant's allegation of improper behavior against Cousins. The mere existence of appellant's suit, which was stayed pending the outcome of his trial, could not reasonably be expected to shed light on Cousins' motives to falsify. Moreover, the court could have concluded reasonably that mentioning the case might only confuse the jury.

## V

Prior to trial, appellant sought to depose Katherina Murri, an eyewitness to Eggiman's murder, who subsequently had returned to her native Switzerland. Appellant's motion to depose was granted.

During direct examination, appellant secured Murri's statement that she erred in earlier selecting appellant's photograph as that of the gunman. On cross-examination, the prosecutor showed Murri the picture. Murri recalled that she had picked it because the gunman's eyes matched those in the photograph. However, she was "not one hundred percent sure that that is the man." On redirect, the photograph identification was not mentioned by defense counsel or the witness.

Upon returning to Washington, the prosecutor notified appellant that he intended to use Murri's deposition, which had been videotaped, in his case-in-chief. Appellant objected, and claimed that the government was precluded from using a deposition taken upon his request. The court disagreed. After viewing and editing the deposition, the court allowed the prosecutor to show Murri's cross-examination to the jury, followed by her direct and redirect examina-

tion. Appellant now attacks this procedure on two constitutional fronts.[22]

■ First, it is contended that the government's tactic violated appellant's Sixth Amendment confrontation right. Appellant's position essentially is that the deposition enabled the prosecutor to prove part of his case through the use of leading questions, while appellant did not have the opportunity to cross-examine the witness. Relying upon *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), we reject this argument.

In *Roberts*, defense counsel had called a witness at a preliminary hearing. Despite persistent examination, the witness made several statements incriminating Roberts. The government was permitted to use the transcript of the testimony in its rebuttal at trial. *Id.* at 58–59, 100 S.Ct. at 2535.

Roberts argued that the transcript was inadmissible because he was not afforded the opportunity to formally cross-examine the witness.[23] Her statements, therefore, lacked "indicia of reliability" necessary to satisfy the Confrontation Clause. *See Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). The Court agreed that the clause served "to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence," *Ohio v. Roberts, supra*, 448 U.S. at 65, 100 S.Ct. at 2539, but held that this function had been served by defense counsel's queries, which "clearly partook of cross-examination as a matter of *form.*" *Id.* at 70, 100 S.Ct. at 2541 (emphasis in original). Furthermore, the aggressive questioning

> comported with the principal *purpose* of cross-examination: to challenge "whether the declarant was sincerely telling

837–42 (1981) (harmless error to limit cross-examination concerning civil suits filed by witness against defendant).

**22.** We find appellant's argument that the procedure in issue violated Super.Ct.Crim.R. 15 to be without merit. *See United States v. Squella-Avendano*, 478 F.2d 433, 439 (5th Cir.1973) (use

of adverse party deposition in rebuttal); 5 Wigmore, Evidence § 1389 (Chadbourne Rev.1974).

**23.** As in the instant case, Roberts' attorney had not sought permission to use leading questions during direct examination of the witness.

what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed."

*Id.* at 71, 100 S.Ct. at 2541 (emphasis in original; citation omitted); *see also* C. McCormick, Evidence § 255 (2d ed. 1972).

Our reading of the transcript confirms that appellant's direct and redirect examination resembled in form, and served the purpose of, traditional cross-examination.[24] Because the functional equivalent of cross-examination was available to appellant, the government's use of Murri's deposition did not usurp his confrontation rights.

Appellant's second constitutional challenge is that the government's use of Murri's testimony violated his right to effective assistance of counsel. Appellant argues that, because Murri was unavailable for trial, the only way in which defense counsel could preserve his right to use her testimony was by deposition. The court's ruling, however, prevented defense counsel from deciding, after the deposition was taken, to refrain from later "calling" Murri as a "witness." In light of the court's ruling, in other words, defense counsel forfeited the option of keeping Murri's testimony from the jury, by deciding to take her deposition pretrial, "before he had even heard the government's evidence." This dilemma, argues appellant, blocked his attorney's independent judgment of how best to present the defense.

Appellant cites *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), as an analogous case. *Brooks* struck down a procedural rule that required a defendant to testify immediately after the government's case, or not at all. The Court held that the rule violated both the privilege against self-incrimination and the right to counsel. *Id.* at 612, 92 S.Ct. at 1895.

We are not persuaded that *Brooks* dictates the result sought by appellant. In that case, the Supreme Court emphasized the importance of a defendant's decision, aided by counsel, whether to testify. *Id.* at 609, 612, 92 S.Ct. at 1893, 1895. The voided rule served to foreclose all but one option. *Id.* at 612, 92 S.Ct. at 1895.

[T]he penalty for not testifying first is to keep the defendant off the stand entirely, even though as a matter of professional judgment his lawyer might want to call him later in the trial. *The accused is thereby deprived of the "guiding hand of counsel" in the timing of this critical element of his defense.*

*Id.* at 612–13, 92 S.Ct. at 1895 (emphasis added).

 Nothing in *Brooks* restricts the *government's* ability to use available evidence, however. Nor does its rationale apply to a situation in which a tactical decision made by the defendant or his attorney ultimately works to the government's advantage. In this case, defense counsel's decision to depose Murri created a risk that the government would seek to use her testimony at trial. We have held that the testimony was sufficiently reliable for confrontation purposes and, distinct from defendant's testimony at issue in *Brooks,* appellant here can claim no privilege barring government use of the deposition.[25] That a tactical decision by defense counsel serves to limit his client's subsequent options, or to create a tactical opportunity for the government, cannot be equated with the rule in *Brooks,* which prevented counsel from exercising independent judgment in the first instance. The trial court's rul-

---

**24.** We have taken into account the apparent effectiveness of the questioning as well. *See United States v. Hsu,* 439 A.2d 469, 472 (D.C. 1981).

**25.** The Court's opinion in *Brooks* seemed to acknowledge the relationship between the Fifth Amendment privilege and the right to counsel, holding that the state's procedural rule violated the former and, "[f]or closely related reasons," the latter. *Id.* at 612, 92 S.Ct. at 1895.

ing did not infringe appellant's right to counsel.[26]

## VI

■ Appellant contends that the prosecutor's rebuttal argument contained prejudicial comments warranting reversal. His charge that the prosecutor attacked defense counsel's integrity does not survive an impartial reading of the record. We also reject the allegation that the prosecutor misstated the evidence.[27]

■ Appellant further argues that the prosecutor gave his personal opinion to the jury by characterizing the theory of appellant's case as "silly," "outlandish," and "the Heinz 57 reasons why [appellant] cannot be guilty." We do not think that these comments were substantially prejudicial because, read in context, they were conclusions offered by the prosecutor after reviewing the evidence adduced at trial. *Cf. Kleinbart v. United States*, 426 A.2d 343, 352 (D.C.1981) (prosecutor argued from evidence that witness was perjurer).

■ Finally, appellant contends that the prosecutor improperly offered his personal opinion to the jury about a witness' credibility. During summation, defense counsel had argued that "[Betty] Beynum, the evidence shows, is not telling the truth." The prosecutor responded in rebuttal that "we stand by Mrs. Beynum as a witness in this case, because she came in here and she told you the truth." This comment clearly was improper, and we note with disapproval that the prosecutor in this case previously has been admonished to avoid stating his personal views at trial. *See McCowan v. United States*, 458 A.2d 1191, 1198 (D.C. 1983); *Powell v. United States*, 455 A.2d 405, 408 (D.C.1982); *Dyson v. United States*, 450 A.2d 432, 440 (D.C.1982). Viewed in context, however, we are not persuaded that the impropriety here war-

rants reversal under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *Compare Powell v. United States, supra*, 455 A.2d at 408, 411.

■ Appellant's conviction on one count of armed robbery is vacated. His other convictions are all affirmed.

*So ordered.*

---

**26.** We find no abuse of discretion in allowing the government to use Murri's cross-examination before her direct and redirect examination. *Brooks* allowed that "nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof ...." *Id.*

at 613, 92 S.Ct. at 1895; *see also Gregory v. United States*, 393 A.2d 132, 137 (D.C.1978).

**27.** The prosecutor merely highlighted the fact that *Betty Beynum* had testified that she loved all her children equally.