**Julio C. RODRIGUEZ, Appellant**

v.

**UNITED STATES, Appellee.**

No. 97–CF–1924.

District of Columbia Court of Appeals.

Argued Oct. 31, 2000.
Decided Jan. 25, 2007.

Richard S. Greenlee, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Thomas S. Rees, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., and Linda Otani McKinney, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, and STEADMAN and TERRY, Senior Judges.*

TERRY, Senior Judge:

Appellant, Julio Rodriguez, was indicted for armed robbery and carrying a dangerous weapon. After a jury trial, he was acquitted of those charges, but was found guilty of the lesser included offense of

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

robbery. He appeals from his robbery conviction, contending that the trial court erred by allowing the government to elicit prejudicial testimony from police officers about their prior contacts with him, by refusing to impose sanctions on the government for failing to preserve an item of evidence, and by instructing the jury on the lesser included offense of robbery even though the evidence, in his view, did not support such an instruction. We affirm.

## I

### A. *The Robbery and Its Aftermath*

William Woodson testified that Rodriguez and another man, Angel Lopez, robbed him on the morning of June 28, 1996. On that day Woodson had gone to an apartment on Columbia Road, N.W., in order to buy some crack cocaine from Lopez. While Woodson waited for Lopez to get the cocaine, Rodriguez entered the room and, apparently still angry over a prior argument, punched Woodson in the chest and threatened him with what Woodson described as a "scratch awl." Rodriguez and Lopez then took from him a pouch or "fanny pack," a broken watch, a belt, a pair of sandals, a paycheck, and $60 in cash.

After the robbers left, Mr. Woodson picked up his glasses and some personal papers which had fallen on the floor, and then he too left the building. When Woodson described the robbery to some people on the street, one of them told him which way the robbers had fled. Woodson headed in that direction, and a few minutes later he found Rodriguez and Lopez at the corner of 15th and Irving Streets, N.W. He asked for his money back, but they refused to return it. Rodriguez taunted

him by waving a piece of paper in his face which he later concluded was possibly his stolen paycheck.

Quickly recognizing that the two men would not return his money, Mr. Woodson went back to the apartment where the robbery had occurred, looking for his keys. This time his quest was successful: a woman whom he had seen there earlier gave him the keys but said she knew nothing about the robbery. Woodson left the apartment again, intending to walk home.

Luckily, Mr. Woodson saw a police car less than a block away. He flagged it down and told the officers inside—Emiliana Rodriguez, Harry Weeks, and Emilio Martinez—the details of the robbery. The officers testified that Woodson was disheveled and barefoot (the robbers had taken his sandals) and appeared to be nervous and "panicking," but not under the influence of alcohol or drugs. He described the robbers to the officers, stating that one of them appeared to be Cuban and the other Puerto Rican. Upon hearing these descriptions, the officers recalled seeing Rodriguez, Lopez, and another Hispanic man named Tartabull, wave to their patrol car as it drove past them earlier that morning. These men were known to some members of the police force as "the Cubans." Suspecting them, the officers broadcast a lookout for three Hispanic males.

Shortly thereafter, another officer, Edward Soto, detained Lopez and Tartabull in a nearby alley. Mr. Woodson was taken there and identified Lopez as one of the robbers. Lopez had in his possession Woodson's sandals and pouch, which contained the broken watch, and was carrying an awl in his pocket.[1] The pouch's fasten-

1. Officer Soto testified that when he first stopped Lopez and Tartabull in the alley, he directed them both "that if they had any weapons, to take them out of their pockets and drop them to the ground." Lopez then "pulled out a sharp object" from his right

ing device was broken when the police recovered it from Lopez. While on the scene, the police photographed the awl, the sandals, the watch, and the pouch. They kept the awl but returned the other items to Mr. Woodson, who testified that he later threw away the pouch because the clasp had been broken during the robbery. On the basis of Mr. Woodson's identification, Lopez was placed under arrest, but Tartabull was released after Mr. Woodson told the officers that he was not the second robber. Accompanied by Mr. Woodson, the police continued looking for the second robber that morning, but they were unsuccessful.

About a month after the robbery, Woodson went to the police station to look at an array of photographs, which included a picture of Rodriguez because the police suspected that he might have been involved. Woodson identified Rodriguez from the array as one of the robbers, and the police arrested him three days later.

Lopez and Rodriguez were later jointly indicted as co-defendants. Shortly before trial, however, Lopez entered a plea of guilty to robbery, and Rodriguez was tried alone.

### B. *Testimony about Prior Contacts*

During a pre-trial hearing, some police officers testified that Rodriguez was well known to officers patrolling his neighborhood and that they had had contact with him on other occasions prior to the day of the robbery. Concerned that evidence of these prior contacts with the police might suggest to the jury that Rodriguez had a prior criminal record or at least a criminal disposition, defense counsel requested a ruling *in limine* to prohibit the govern-

ment from eliciting such testimony at trial. The court denied the motion, stating:

> Police officers walk beats every day.... [T]hey know people from the police Boys' Club, they know shop owners. Police officers see and know a lot of people; that doesn't mean that they arrested the person. So I don't think that the prejudicial [effect] outweighs the probative [value].

During her opening statement, the prosecutor said that the arresting officers had had "prior contacts" with Rodriguez and that they knew him "from the area" and "from this particular neighborhood." After summarizing the facts of the robbery and Mr. Woodson's report to the police, the prosecutor continued: "So what they [the officers] did, ladies and gentlemen, is, based on their knowledge of Mr. Rodriguez, they located a photograph of Mr. Rodriguez and inserted it into a photo array of nine photographs." Defense counsel objected to the prosecutor's emphasis on the fact that "these police officers know my client," but the court overruled the objection.

During the trial, the prosecutor elicited testimony from three officers about their prior contacts with appellant. The first one to testify, Officer Emiliana Rodriguez, stated that she knew appellant and Lopez "from the area" and that she had "had prior contacts with them." Defense counsel objected to these references as gratuitous and prejudicial. The court offered to give the jury a limiting instruction that "just because someone has prior contact, it doesn't mean it's under adverse circumstances," but counsel declined the offer. The court warned the prosecutor, however, to "be careful" so as not to give the impression to the jury that "these previous

---

rear pocket and threw it on the ground near his feet. A few minutes later, when Mr. Woodson arrived with the other officers, his attention was called to this object (still on the ground), and he identified it as the weapon used in the robbery.

contacts were an arrest type or stop and search type." The prosecutor assured the court that she had instructed the officers "not to say anything about the nature of their contacts and only to limit it to the most neutral terms, that they have seen them in the area and they have just had prior contact with them. . . ."

Later in the trial, Officer Soto testified that he "knew [Rodriguez] from the area and . . . had had contact [with him] the prior day." Defense counsel again objected, but the court overruled the objection, reasoning that "contact" with a police officer "doesn't mean it's adverse circumstances." Officer Soto then said that he knew Tartabull was Cuban and that Tartabull "was in the company of Mr. Julio Rodriguez [appellant] on [June] 27th," the day before the robbery.

Finally, Officer Martinez testified that he knew Rodriguez, Tartabull, and Lopez "just from the area, from patrolling the area. I have patrolled the same area for seven years. I'm quite familiar with just about everyone in the area." When asked when his last contact with Rodriguez occurred before June 28 (the date of the robbery), Martinez replied, "June 27th, the day before." Martinez then stated that Officer Soto had reported over the radio on the morning of the robbery that he "had two subjects stopped," Lopez and Tartabull, and that "one of them they had stopped the day before, one of the Cubans."

The defense presented no evidence.

## II

Rodriguez maintains that the testimony about his prior contacts with the police was irrelevant and, because it was akin to evidence of other crimes, unduly prejudicial. He therefore contends that the trial court abused its discretion in allowing this testimony to be heard by the jury.

■ A trial judge has "broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982). In making that determination, the judge must consider any applicable evidentiary rules and determine "whether the evidence is relevant to a material issue and, when balanced against competing interests, is not likely to inflame or unduly prejudice the jury." *Id.* at 960 (citation omitted). This court will not substitute its judgment in such matters for that of the trial court; "our scope of review is limited to whether the trial court has abused its discretion." *Id.* (citations omitted).

■ Our first consideration is whether the evidence of prior contacts was relevant. Relevant evidence is simply "that which tends to make the existence or nonexistence of a fact more or less probable" than it would be without the evidence. *Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *see also* FED.R.EVID. 401. This is not a particularly stringent test. *Street v. United States*, 602 A.2d 141, 143 (D.C.1992). In this case the trial court ruled that the evidence was relevant because it tended to make more likely the fact that Rodriguez was properly identified by the police.[2] Al-

---

2. The court stated that the testimony indicated "how [the police] knew this man; otherwise, they would not have been in the same position to pick out a picture to place in the array." Rodriguez relies on cases suggesting that such testimony is improperly admitted when it is offered merely to explain why the police took certain actions in arriving at the suspect whom they eventually arrested, including why they placed his photograph in the array. These cases are distinguishable because they deal with the admission of hear-

though we recognize the potential for prejudice in such evidence, we have upheld similar rulings in several other cases in the past. For example, in *Durham v. United States*, 743 A.2d 196 (D.C.1999), we held that it was "manifestly relevant" for a police officer to describe the suspicious activities that first drew his attention to the defendant:

> It is unrealistic to expect the government to truncate its case-in-chief by utilizing only bare bones testimony about an arrest team stopping a citizen merely because of the word from an officer far away. The arrest need not be tersely described for the jury as a non sequitur, an event that erupted out of the blue.

*Id.* at 207. *Accord, e.g., Butler v. United States*, 688 A.2d 381, 389 (D.C.1996) (upholding admission of testimony that defendant "had numerous contacts" with a police officer "in an official police manner"); *Bean v. United States*, 576 A.2d 187, 188 n. 2 (D.C.1990) (finding "no merit" in appellant's argument that trial court erred in allowing police officer to testify that he was able to identify defendant "due to a previous official encounter"); *Ford v. United States*, 396 A.2d 191, 194 (D.C. 1978) (upholding admission of officer's testimony that defendant "had an outstanding arrest warrant" to explain why three officers had gone to a certain location to execute that warrant; such evidence "was simply part of a permissible explication of the events which led up to appellant's arrest").

Especially pertinent is our decision in *Perritt v. United States*, 640 A.2d 702 (D.C.1994), in which we upheld a trial court decision to admit police testimony "regarding the investigative procedures employed in the case," *id.* at 704, which was considerably more extensive and detailed—and potentially prejudicial—than that presented here. We held "that the detective's testimony, which explained the course of the investigation, was relevant because it was of interest for the jury to know why an arrest did not occur ... [until] two months after the offense." *Id.* at 705. In our discussion we quoted the following language from *Morris v. United States*, 398 A.2d 333 (D.C.1978):

> [J]uries in criminal cases, before being called upon to decide the awesome question of guilt or innocence, *are entitled to know more of the circumstances which culminate in a courtroom identification*—an event which, standing alone, often means very little to a conscientious and intelligent juror, who routinely expects the witnesses to identify the defendant in court and who may not attach great weight to such an identification in the absence of corroboration.

*Id.* at 337–338 (emphasis added in *Perritt*), quoting *Clemons v. United States*, 133 U.S.App. D.C. 27, 40, 408 F.2d 1230, 1243 (1968) (en banc), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). In light of these and similar cases, we hold that the trial court did not abuse its discretion in concluding that the evidence of prior contacts was relevant.

▮▮ The principal issue thus becomes whether the probative value of the testimony was outweighed by its prejudicial effect. When relevant evidence is challenged on the ground of unfair prejudice, it may be excluded only if "the danger of unfair prej-

---

say evidence and with whether the state-of-mind exception to the hearsay rule should apply. *See United States v. Evans*, 342 U.S.App. D.C. 189, 216 F.3d 80, *cert. denied*, 531 U.S. 971, 121 S.Ct. 411, 148 L.Ed.2d 317 (2000); *United States v. Hilliard*, 186 U.S.App. D.C. 312, 569 F.2d 143 (1977); *United States v. Forrester*, 60 F.3d 52 (2d Cir.1995). The testimony at issue in this case, except for Officer Martinez's recounting of Officer Soto's radio broadcast (about which Soto was available to testify), was not hearsay.

udice *substantially* outweigh[s][its] probative value...." *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C.1996) (en banc) (emphasis in original) (adopting FED. R.EVID. 403 as a correct statement of District of Columbia law), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). We are satisfied that the testimony at issue was not so prejudicial as to require its exclusion.

■ Preliminarily, we must consider whether the prior contacts testimony in this case should be considered evidence of other crimes or bad acts, as appellant contends.[3] This court has held on several occasions that evidence of prior contacts with the police does not necessarily amount to evidence of other crimes or bad acts. *See, e.g., Chappelle v. United States*, 736 A.2d 212, 215 (D.C.1999); *Terrell v. United States*, 721 A.2d 957, 960–961 (D.C. 1998); *Ford*, 396 A.2d at 193–194. In light of these cases, and having heard no persuasive argument to the contrary, we are satisfied that the court did not err in concluding that the neutral references to Rodriguez's prior contacts with the police did not constitute proof of other crimes or bad acts.

■ Also significant is Rodriguez's refusal of a curative instruction limiting the impact of the prior contacts testimony. Since defense counsel rejected the trial court's offer to give such an instruction, which could have mitigated any likely prejudice, we view with some skepticism his present claim that the court erred by admitting the evidence. "[A] trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury, and a corrective instruction is offered but de-

clined." *Smith v. United States*, 665 A.2d 962, 967 (D.C.1995) (citing *Goins v. United States*, 617 A.2d 956, 959 (D.C.1992)).

Somewhat more troublesome is Officer Soto's testimony referring to his "stop" of Lopez and Tartabull, which at least suggests an adversarial encounter rather than a more neutral "contact." Such an inference could be, at least arguably, sufficient to bring this testimony within the category of evidence of other crimes. We conclude in this instance, however, that it did not. The reference to the "stop" was elicited during Officer Soto's description of the events immediately prior to the arrest of Lopez, and during the search for Rodriguez (unsuccessful, as it turned out, until a month later) for the robbery for which he was on trial. The only reference to Rodriguez was as follows:

Q. [by the prosecutor]: Do you know Tartabull?

A. Yes, I do.

Q. How do you know Tartabull?

A. Tartabull was in the company of Mr. Julio Rodriguez on the date of the 27th [the day before the robbery]. They were together.

Q. And at the time that you stopped Lopez and Tartabull ... was Mr. Rodriguez anywhere around?

A. No.

While this testimony might have caused some prejudice to Lopez if he had been on trial, we fail to see how it could have prejudiced Rodriguez, since it made clear that Rodriguez was not even present during the "stop." We think that this testimony, considered in context, was at worst "a permissible explication of the events

---

3. "[T]he law in the District of Columbia is that evidence tending to prove the defendant's propensity to commit crime is not admissible for that purpose, but may be admitted if the government shows that the importance of the evidence to proving a material fact in issue outweighs its potential for unfair prejudice." *Wilson v. United States*, 690 A.2d 468, 471 (D.C.1997) (citing *Johnson*, 683 A.2d at 1092–1093).

which led up to appellant's arrest," *Ford,* 396 A.2d at 194, and therefore admissible. *Accord, Perritt,* 640 A.2d at 705 ("it was of interest for the jury to know" why defendant was not arrested until two months after the offense); *cf. Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983) ("such evidence is admissible when relevant to explain the immediate circumstances surrounding the offense charged").[4] Moreover, the trial judge found that the probative value of this evidence outweighed its prejudicial effect. *See Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982). We have no reason to question that finding or to substitute our assessment for that of the judge who actually heard the testimony. *See, e.g., Durham,* 743 A.2d at 206–207.

In any event, we think the likelihood of prejudice was slight. As the government points out, the evidence established that both Lopez and Rodriguez (along with the complainant, William Woodson) were present in a "crack house" when the robbery took place, a fact which strikes us as considerably more prejudicial than the mere mention of prior "contacts," or even a prior "stop" (which did not involve appellant Rodriguez). Moreover, the jury acquitted Rodriguez of both charged offenses, including armed robbery, and found him guilty of only the lesser included offense of (unarmed) robbery. The government

maintains, and we agree, that this verdict shows that the jury "carefully sift[ed]" the evidence without being unduly influenced by any reference to his prior contacts with the police.

For these reasons, we find no abuse of discretion and no legal error in the trial court's refusal to exclude the evidence about prior contacts.[5]

### III

On the morning of the robbery, the officers who arrested Lopez returned most of Woodson's personal possessions to him, including his pouch. In particular, the officers testified that they returned his sandals because he was barefoot and his pouch because he said he needed it to carry other items of personal property. Mr. Woodson brought his sandals and watch to trial, but, because the clasp on the pouch was broken, he threw it away soon after the police gave it back to him. He testified that the pouch was in good condition before the robbery, but that the clasp was broken when it was returned to him after the police recovered it from Lopez. In her summation to the jury, the prosecutor argued that the damaged condition of the pouch supported the government's allegation that a robbery had occurred, rather than a consensual exchange as claimed by Rodriguez.[6]

**4.** There was also a brief mention in Soto's report, as recounted by Martinez, that "one of them"—*i.e.,* Lopez or Tartabull—had been "stopped the day before," apparently by Soto. Nothing was made of this remark, however, and we do not find it sufficiently prejudicial, viewed in context, to warrant reversal, especially since it did not refer to Rodriguez.

**5.** In his reply brief, Rodriguez cites *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and its progeny for the proposition that, because Rodriguez was willing to concede that he was with Lopez on the morning of the robbery, the court had no

discretion to allow the government to introduce evidence to prove that conceded fact. Rodriguez reads *Old Chief* far too broadly. *See Daniels v. United States,* 738 A.2d 240, 249–253 (D.C.1999).

**6.** The defense theory of the case was that no robbery occurred at all, and that the encounter between Mr. Woodson and Messrs. Lopez and Rodriguez was actually an exchange of property (sandals, watch, etc.) for crack cocaine.

Under D.C.Code § 5–119.02 (2001), police officers are required to preserve stolen property that comes into their possession. The officers in this case testified that, although they knew of the requirements of this statute and the general order implementing it, they returned Woodson's belongings to him because they believed that photographing them would suffice. Before trial, defense counsel moved for sanctions against the government and sought an order precluding the government from introducing pictures of the pouch or even the tangible objects that had been preserved. The trial judge refused to impose sanctions because he concluded that the police had not willfully or deliberately lost the evidence, but that their failure to comply with the statute "was due more to inadvertence. . . . I would have to find that they deliberately did this to gain an advantage to your client's disadvantage before I would be in a position to issue some sanctions." Rodriguez now contends that this ruling was error.

 Any decision to impose sanctions for the loss or destruction of evidence is within the discretion of the trial court. *Davis v. United States*, 641 A.2d 484, 494 (D.C.1994), *cert. denied*, 514 U.S. 1028, 115 S.Ct. 1384, 131 L.Ed.2d 237 (1995). In determining what sanction, if any, to impose, "the court should 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.'" *Montgomery v. United States*, 384 A.2d 655, 662 (D.C. 1978) (citation omitted). "Deliberate destruction of discoverable evidence designed to hinder preparation of the defense case will be weighed heavily against the government" and will generally result in "full sanctions. . . ." *Cotton v. United States*, 388 A.2d 865, 869 (D.C.1978). On the oth-

er hand, if there has been a "good faith loss," the court may excuse it and refuse to apply sanctions. *Id.* The court in this case found that the officers' actions in returning the evidence to Mr. Woodson were not so culpable as to require that sanctions be imposed.

In a case with very similar facts, this court upheld the denial of a defense request for sanctions. In *Marshall v. United States*, 340 A.2d 805 (D.C.1975), a robbery victim's stolen purse was found by a police officer who returned it to her. Because it had been damaged by being left out in the rain, the victim threw the purse away. Defense counsel moved to strike the victim's testimony, asserting that if the purse had been made available to him for fingerprint analysis, "it might well have produced evidence favorable to the defense." *Id.* at 809. The trial court denied the motion, concluding that the defense had not been prejudiced by the unavailability of the purse. We affirmed that ruling, holding that although "the purse should have been preserved by the police as potential evidence, at least until the defense was given an opportunity to examine it," the trial court's reasoning was supported by the record and did not constitute an abuse of discretion. *Id.* We held, in particular, that the materiality of the purse was "highly speculative." *Id.* at 810.

██ We reach the same conclusion here; indeed, we see no meaningful difference between this case and *Marshall.* Although the police should have retained the recovered stolen items (with the possible exception of the sandals, of which the barefoot Mr. Woodson had an immediate need), there is nothing in the record to suggest that their actions were anything other than a good faith effort to aid a citizen in distress. They were admittedly aware that they were required by a statute and a general order to hold on to the stolen

items, but they testified that they thought they were complying with the statute and the general order by taking photographs of them. While the court's finding that the return of the stolen items to Mr. Woodson was due to "inadvertence" was not quite correct, we think the record supports the conclusion that the police did not deliberately return the stolen items to Mr. Woodson in order to "gain an advantage" over the defense. There is nothing in the record to suggest that the police acted in bad faith. Moreover, we are satisfied that the materiality of the pouch with the broken clasp was no less "speculative" than the materiality of the rain-soaked purse in *Marshall*, and that its absence had no significant impact on the outcome of the case. We conclude that *Marshall* is close enough to the present case on its facts to be dispositive of this claim of error. In the circumstances presented here, the police action does not, under cases such as *Montgomery* and *Cotton*, require the imposition of sanctions.

## IV

At the government's request, and over defense counsel's objection, the trial court instructed the jury on robbery as a lesser included offense of armed robbery. Rodriguez contends on appeal that the court erred by giving this instruction. He maintains that a jury could not reasonably acquit him of armed robbery and carrying a dangerous weapon yet find him guilty of (unarmed) robbery. We disagree.

■■■ A lesser included offense instruction is warranted when "(1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge." *Rease v. United States*, 403 A.2d 322, 328 (D.C.1979) (citations omitted). The requirement of a sufficient evidentiary basis is "met in one of two ways: (1) where

there is conflicting testimony on the factual issue, and (2) where the lesser included offense is fairly inferable from the evidence, including a reconstruction of the events gained by accepting testimony of some or all of the witnesses, even in part." *Robinson v. United States*, 388 A.2d 1210, 1213 (D.C.1978) (citations omitted).

■■■ In this case Mr. Woodson testified that it was Rodriguez who threatened him with the awl during the course of the robbery. The weapon, however, was found on Lopez when he was arrested, and there was no evidence that anyone other than Woodson ever saw Rodriguez in possession of the awl. A crime scene search officer testified that she had been unable to recover any fingerprints from the awl, and defense counsel pointed out to the jury in his closing argument that "none of Mr. Rodriguez's fingerprints were on it." The jury therefore could rationally credit Woodson's testimony that Rodriguez was one of the robbers, but reject his testimony that it was Rodriguez who brandished the weapon. It is, of course, well established that a jury may credit part of a witness' testimony while disbelieving another part. *See, e.g., Shuler v. United States*, 677 A.2d 1014, 1017 (D.C.1996). The jury could reasonably find that a robbery did occur but that the awl was not used as a weapon by Rodriguez in its commission, since it was in Lopez's pocket when the police apprehended him a short time later. We note that the jury was not instructed on aiding and abetting—indeed, neither party requested such an instruction—and thus the jury could not have reasonably found that Rodriguez aided and abetted Lopez in the commission of an *armed* robbery. If the jury found that Rodriguez had no weapon in his hand while the robbery was taking place, or even if the jury had a reasonable doubt about whether he did or did not, they

could still find him guilty of (unarmed) robbery—which in fact is what happened. We are not presented with the sort of "bizarre reconstruction" [7] of the evidence that would require reversal on the ground that the lesser included offense instruction should not have been given.

## V

The judgment of conviction is

*Affirmed.*

---

7. *United States v. Sinclair,* 144 U.S.App. D.C. 13, 15, 444 F.2d 888, 890 (1971).