**Eric R. HILL, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 05–CF–588.

District of Columbia Court of Appeals.

Argued Oct. 2, 2008.
Decided Oct. 30, 2008.

■

William P. Farley, Washington, appointed by the court, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and TERRY, Senior Judge.

REID, Associate Judge:

A jury found appellant, Eric R. Hill, guilty of two counts of assault with a dangerous weapon (knife and pistol),[1] carrying

---

1. D.C.Code § 22–402 (2001).

a dangerous weapon (knife),[2] possession of a firearm (pistol) during a crime of violence,[3] and threatening to injure a person (Marlin T. Hill).[4] Appellant argues that (1) the trial court violated his Sixth Amendment right to represent himself by appointing unwanted standby or advisory counsel to assist him; (2) his due process rights were violated when the trial court refused to allow him to proceed with his defense on the second day of trial; and (3) the trial court violated his Sixth Amendment right to a speedy trial. Discerning no error, we affirm the judgment of the trial court.

### FACTUAL SUMMARY

The government presented evidence showing that on June 24, 2004, Marlin Hill drove his UPS truck into the driveway of the Museum Square Apartments, located in the 400 block of K Street, in the Northwest quadrant of the District of Columbia. He exited his vehicle to deliver packages, and when he returned to his truck, two ambulances had blocked his path. Eric Hill approached the UPS truck and repeatedly insisted that Marlin Hill could get by the ambulances. After Eric Hill kept repeating the same thing, Marlin Hill declared that he was "under enough stress . . ." and requested that Eric Hill leave him alone. Undeterred, Eric Hill approached the passenger side of the UPS truck, carrying a knife with a T-shaped handle. Marlin Hill became frightened, grabbed a hand cart and told Eric Hill that he would hit him with the cart if he ventured into the truck. Eric Hill walked

behind the truck and went into the Museum Square apartment building, where he lived.

About two minutes later, while Marlin Hill was waiting for the ambulances to move, he noticed Eric Hill about a car length away from the UPS truck, and heard him curse and state: "Yeah, you said you were going to kill me. . . . You are a big shot now." He then pulled up his shirt, and Marlin Hill saw Eric Hill's hand on a pistol. When Marlin Hill asked him what he was talking about, Eric Hill cursed and replied: "You know, I will kill you. I will kill you."

Bruce Spivey, the maintenance supervisor at the Museum Square Apartments, testified that he knew Eric Hill as a resident of the apartment building. He saw an "agitated conversation" or "some type of argument" between Marlin and Eric Hill while the UPS truck was blocked in the driveway by the emergency vehicles. Eventually, after one of the emergency vehicles had moved a little, he saw Marlin Hill trying to make his way out of the driveway. Eric Hill, who had his back to Mr. Spivey, was running alongside the truck and making "agitated gestures," with his elbows extended. After Eric Hill had re-entered the apartment building, Marlin Hill returned to the building, looking "upset, afraid, frightened," and he told Mr. Spivey, "The guy pulled a gun on me." When Mr. Spivey identified the man as Eric Hill, a resident of the building, Marlin Hill declared, "Well, I need to call the police."[5]

**2.** D.C.Code § 22–4504(a).

**3.** D.C.Code § 22–4504(b).

**4.** D.C.Code § 22–1810. Eric Hill and Marlin Hill are not related.

**5.** Detective Thomas Austin–Braxton, a government witness, asserted that he and his

partner, Detective Goldberg, met Marlin Hill at a restaurant on New York Avenue three days after the incident. The detectives showed him a photo array, and Marlin Hill identified Eric Hill as the perpetrator. After the government filed a criminal complaint against Eric Hill, Detective Joseph Oh went to Eric Hill's apartment, with others, to serve an

## ANALYSIS

Mr. Hill contends that he "specifically and vociferously protested the presence of appointed counsel." Nevertheless, he complains, "[t]he trial court denied [him] the right to sit alone in front of the jury and conduct the trial *pro se* without the jury seeing assigned counsel reviewing evidence and appearing to be part of a 'trial team.'" He insists that he should have been "permitted to control his own defense and requiring him to accept advisory counsel with the jury's knowledge is unconstitutional." He emphasizes that the jury must know that he is representing himself. He also complains that "he was denied his due process constitutional rights to defend himself," that is, "the right to offer the testimony of witnesses and present a defense," because the trial court incorrectly declared that he had rested his defense on May 10, and would not allow him to continue his presentation on May 11. The government asserts that standby or advisory counsel "did nothing to interfere with or inhibit appellant's assertion of his right to proceed *pro se* in this case." Furthermore, the government contends, the "modest involvement [of] standby counsel—being introduced to the jury panel, sitting at defense table, and examining those documents handed to him and appellant by the prosecutor—did not remotely violate appellant's right of self-representation."

### The Factual Context of the Right to Self–Representation and the Due Process Issues

On September 9, 2004, Mr. Hill informed the trial judge that he had expressed his desire to represent himself when he appeared before a magistrate judge. During the trial court's inquiry concerning his ability to represent himself, Mr. Hill re-

vealed that he is a high school graduate, studies law at home on his own, and had represented himself once before with a good result. He insisted that he was able to represent himself and did not want a public defender. At the trial court's request, on September 13, 2004, Dr. Mary Elizabeth Kenel, a clinical psychologist employed by the Forensic Services Administration of the District's Department of Mental Health, conducted a competency evaluation. She reported that Mr. Hill was diagnosed, on October 22, 1997, with "Schizophrenia, Paranoid, Chronic with Acute Exacerbation," and on February 5, 2002, with "Psychotic Disorder Not Otherwise Specified." He suffers from depression and Grand Mal seizures. However, Dr. Kenel concluded that he was able to function properly, and that "mental health factors do not substantially impair his capacity to have a factual and rational understanding of the proceedings against him and to properly assist counsel with the preparation of his defense." Dr. Kenel was aware of Mr. Hill's "determination to represent himself in court," and found "nothing to indicate [he] would be unable to conduct himself appropriately in the courtroom, and he identified proper courtroom behavior."

On October 8, 2004, Mr. Hill again appeared before the trial court and asserted that he wanted to represent himself. The trial court determined that Mr. Hill was competent but explained the problems with self-representation, and why Mr. Hill needed a lawyer to advise him. Mr. Hill told the trial judge that he wanted to bring a restraining order against his newly appointed attorney. As he put it, "I don't want him near me." On October 21, 2004, Mr. Hill's assigned counsel filed a motion

arrest warrant and a search warrant. Eric Hill was not at home, and the police forced the lock and entered the apartment. Detec-

tive Oh removed pants containing a T-shaped knife in a pouch, as well as mail belonging to Eric Hill.

to withdraw as counsel, which the trial court granted. The judge explained to Mr. Hill the difficulties of self-representation and the "intricacies of criminal law." He informed Mr. Hill that he would not be treated differently, that he would have to "file appropriate motions," and "serve [them] appropriately." The court concluded that Mr. Hill could represent himself, and scheduled a substantive status hearing for January 19, 2005. The judge appointed another counsel to advise Mr. Hill.

At the trial court's request, on January 26, 2005, Dr. Kenel conducted a competency screening examination of Mr. Hill. Dr. Kenel reported that Mr. Hill "has a basic knowledge of the judicial process and the roles of various court officials." She noted that he was "representing himself at this point," and he was "aware of the need to behave appropriately in the courtroom and expressed his willingness to comply." Finally, she again expressed the opinion that: "Mr. Hill is competent because mental health factors do not substantially impair his capacity to have a factual and rational understanding of the proceedings against him and to properly assist counsel with the preparation of his defense."

Trial began on May 9, 2005. The trial court explained to the jury what it meant when Mr. Hill announced that "he was proceeding pro se":

Pro se means representing himself. I have also asked an experienced lawyer to assist Mr. Hill if Mr. Hill wants that assistance.

So, that is why I have an attorney who will be here available to assist Mr. Hill[,] if Mr. Hill wants that assistance. He is there to stand by and help out, if necessary.

During the *voir dire* of the jury venire, Mr. Hill spoke for himself. As the trial proceeded on May 10, 2005, Mr. Hill made his own opening statement before the jury.[6] He also personally cross-examined all four of the government's witnesses, raising questions about the details of each witness' direct testimony about the K Street incidents, the photo array identification of Eric Hill, and the search of his apartment. When Mr. Hill took the stand as a witness for the defense, the trial court inquired whether he wanted the attorney advisor "to ask [him] a few questions to get [him] oriented or get [him] started." Mr. Hill responded, "No." When he stated, "What I want the jury to know is that the government left out documentation from the lead detective," the government objected, and the trial judge explained that Mr. Hill could not show the jury documents until they had been admitted into evidence. Mr. Hill continued by complaining about the absence of the lead detective from the proceedings. When he again made known his desire that the jury hear the audiotape of the lead detective, the judge said he would listen to it out of the presence of the jury to determine if it was admissible, that he would also look at any documents that Mr. Hill wanted to present to the jury to see whether any could be admitted into evidence, and if Mr. Hill wanted to tell the jury anything else, he certainly could. Mr. Hill responded, "Thanks, guys." He did not give any documents or audiotapes to the judge. The judge then adjourned the proceedings for the day.

The following day, May 11, 2005, the trial court indicated, out of the presence of the jury, that the government could cross-examine Mr. Hill. Mr. Hill protested that

---

6. Over the objections of the prosecutor, Mr. Hill complained about the lead detective not being present and accused him of falsifying evidence. He stated that he had an audiotape which the jury would hear. He took issue with the government's statement of the evidence.

he "didn't put on [his] defense." He took issue with the trial court's statement that he had "rested his defense." After the jurors were brought into the courtroom, and following a short cross-examination of Mr. Hill, the parties made closing arguments. Mr. Hill made his own objections to the government's argument, and addressed the jury himself in behalf of the defense.[7]

### Applicable Legal Principles

 We turn to the legal principles that will guide our analysis. A defendant has a Sixth Amendment "constitutional right to conduct his own defense,"[8] if "he knowingly and intelligently forgoes his right to counsel and ... is able and willing to abide by rules of procedure and courtroom protocol."[9] Furthermore, "[t]he right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process of law."[10] Hence, the trial court may not force a defendant to accept appointed counsel if he chooses to represent himself, even though others might think he needs legally trained counsel. As the Court declared in *Faretta:*

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him.... The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in this particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." [11]

Yet, a trial court may designate standby counsel or an attorney advisor for a self-represented defendant provided certain fundamental principles are not violated. First, the defendant must control his defense, leaving no doubt that he is representing himself:

> In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way.... The *pro se* defendant is entitled to preserve actual control over the case he chooses to pres-

---

7. The trial court interrupted Mr. Hill several times due to improper arguments about matters that were not in evidence, and finally instructed Mr. Hill to "have a seat."

8. *Faretta v. California*, 422 U.S. 806, 836, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

9. *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Initially, in his brief, Mr. Hill asserted that "the trial court was required to appoint counsel when it became apparent that [he] could not appreciate his situation and his mental health was recognized by the trial court as blocking [his] ability to mount a defense." However, at oral

argument, he conceded that he validly waived his right to appointed counsel.

10. *Brown v. United States*, 864 A.2d 996, 1003 (D.C.2005) (citation and internal quotation marks omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.").

11. *Faretta, supra* note 8, 422 U.S. at 834, 95 S.Ct. 2525 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).

ent to the jury.... From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself.[12]

The second fundamental principle centers on the actions of standby counsel or attorney advisor, and forbids any kind of excessively intrusive actions which undercut the jury's perception that the self-represented defendant is in actual control of his defense:

> [T]he objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel. In proceedings before a jury the defendant may legitimately be concerned that multiple voices "for the defense" will confuse the message the defendant wishes to convey, thus defeating *Faretta's* objectives. Accordingly, the *Faretta* right must impose some limits on the extent of standby counsel's unsolicited participation.... [P]articipation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.[13]

*McKaskle* underscores the essence of the control a self-represented defendant must have even if standby counsel, or an attorney advisor, is appointed: "The *pro se* defendant must be able to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial." [14]

Nevertheless, in exercising his constitutional right of self-representation, a defendant "must comply with the established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." [15] Generally, we defer to the trial court to ensure such compliance because a trial judge "has broad discretion to determine the substance, form and quantum of evidence which is to be presented to a jury," and we avoid substituting our judgment for that of the trial court.[16]

The record before us reveals that the trial court did not deviate from the constitutional principles applicable to a defendant desiring to represent himself. The trial court voiced concern in Fall 2004 and early 2005 about Mr. Hill's ability to represent himself. However, in September 2004, and again in late January 2005, prior to Mr. Hill's trial, the trial court sought the opinion of the District's Department of Mental Health, Forensics Services Administration concerning his ability to function properly in court. Dr. Mary Elizabeth Kenel screened and examined Mr. Hill twice. On both occasions she was aware of Mr. Hill's steadfast desire and determination to represent himself. In both of her reports Dr. Kenel concluded that his mental health problem (schizophrenia or psychotic disorder) did "not substantially impair his capacity to have a factual and rational understanding of the proceedings against him ...," and there was "nothing to indicate [he] would be unable to conduct himself appropriately in the courtroom, and he identified proper courtroom behav-

12. *McKaskle, supra* note 9, 465 U.S. at 177, 178, 179, 104 S.Ct. 944.

13. *Id.* at 177, 178, 104 S.Ct. 944 (footnotes omitted).

14. *Id.* at 174, 104 S.Ct. 944.

15. *Chambers, supra* note 10, 410 U.S. at 302, 93 S.Ct. 1038.

16. *Rodriguez v. United States*, 915 A.2d 380, 385 (D.C.2007) (citation and internal quotation marks omitted).

ior."[17] Moreover, on February 16, 2005, the trial court made the required "penetrating and comprehensive examination of all the circumstances" to ascertain whether Mr. Hill validly waived his Sixth Amendment right to counsel.[18] And, before beginning trial, the judge explained to the jury that Mr. Hill would represent himself and that the attorney advisor was available "if Mr. Hill wants that assistance."

▇ Once Mr. Hill's self-representation commenced, he was in actual and complete control of his defense and the trial court allowed him "to present his case in his own way." From *voir dire*, to opening statement, to cross-examination of government witnesses, to putting on the defense, to closing arguments, the jury saw and heard only from Mr. Hill; the jury did not hear "multiple voices" speaking for the defense. Indeed, the attorney advisor neither addressed the jury nor conducted any of the traditional counsel functions while the jury was seated in the courtroom.[19] We are unpersuaded by Mr. Hill's arguments that the mere presence of the attorney advisor near him, and the prosecutor's handing of exhibits initially to the attorney advisor rather than to him, gave the jury the impression that he was not in control of his defense. As *McKaskle* requires, Mr. Hill "had a fair chance to present his case in his own way" at every stage of the trial.[20] Equally significant, the appointed attorney

advisor did not engage in "unsolicited and excessively intrusive participation" in the trial.[21] In short, as *Faretta* and *McKaskle* demand, Mr. Hill, as a self-represented defendant, was in control of his defense throughout his trial, and the jury could not have believed otherwise.

▇ Mr. Hill's due process argument also is unavailing. The record shows that the trial court gave him repeated opportunities to present his testimony, and to mark and submit to the court and the prosecutor any document, including audiotapes of the lead detective, that he wished to introduce into evidence. He did not submit the documentation, and did not direct his testimony to the charges against him and the government's evidence supporting those charges. Significantly, just before the end of Mr. Hill's time as a witness for the defense, the trial judge said to him:

> If there is anything else you would like to tell the ladies and gentlemen of the jury, you certainly can. And I will take a look at all your paperwork and see if there is anything I can admit.

Mr. Hill responded: "Thanks, guys." The trial court understandably interpreted Mr. Hill's words to mean that he had concluded his direct testimony and the presentation of his defense. In sum, on this record we

---

17. Given Dr. Kenel's conclusions on two different occasions, this case is unlike *Indiana v. Edwards*, —— U.S. ——, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), where the Court declared that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial … but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 2388.

18. *See McClinton v. United States*, 817 A.2d 844, 849 (D.C.2003) (citing *Ali v. United States*, 581 A.2d 368, 371–72 (D.C.1990)).

19. Although the attorney advisor made a motion for judgment of acquittal, that motion and the argument in support of it took place while the jury was not in the courtroom. The attorney advisor's renewed motion for judgment of acquittal occurred during a bench conference and the trial court immediately denied it without argument.

20. 465 U.S. at 177, 104 S.Ct. 944.

21. *Id.* at 177, 178, 104 S.Ct. 944.

discern no violation of Mr. Hill's due process rights with respect to the presentation of his defense; the trial court acted properly in requiring Mr. Hill to "comply with the established rules of procedure and evidence ..." [22]

### The Speedy Trial Issue

Mr. Hill complains that he suffered an eleven-month "abusive" delay in his trial without explanation, and that the delay "made it impossible for [him] to conduct his trial," and "to live his life as he saw fit." He claims the delay prejudiced him because of "[t]he stress, incarceration, and [the need] to balance his physical health." [23] The government states that Mr. Hill "was arrested on July 21, 2004, and his trial began 293 days later, on May 10, 2005." The government argues that the delay was "justified and proper" and is attributable to hearings pertaining to Mr. Hill's waiver of his right to counsel and his desire to represent himself; Mr. Hill's illness and his inability to appear on time for the first scheduled trial date (in January 2005); and the appointment of standby or advisory counsel to assist Mr. Hill, if he requested help. In addition, the government contends that Mr. Hill failed to show that he was prejudiced by the delay.

 We dispose of this issue summarily. The Sixth Amendment to the Constitution guarantees a defendant "the right to a speedy ... trial." To determine whether the trial court has violated that right, we examine the familiar factors: "the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." [24] Under either Mr. Hill's or the government's calculation of delay (from the date of the criminal complaint or the date of arrest), the presumption of prejudice was not triggered because the delay was less than one year. [25] Moreover, this is not a case of "deliberate" delay; [26] rather, the trial court endeavored to make certain that Mr. Hill was competent to represent himself and understood the pitfalls of self-representation, and the delay in the first trial date occurred when Mr. Hill suffered a health episode and was unavoidably late for court. The record shows that Mr. Hill repeatedly asserted his desire to proceed with his trial.

In this case, where the delay was less than one year, Mr. Hill had to "affirmatively demonstrate[ ]" prejudice [27] by showing "oppressive pretrial incarceration," his "anxiety and concern," or "the possibility that [his] defense [was] impaired." [28] We conclude that Mr. Hill has not sustained his burden. He experienced no more than five days of pretrial incarceration. His vague references to "stress," "having to

22. *Id.* at 174, 104 S.Ct. 944.

23. Mr. Hill informed the trial court that he suffered from liver cancer. Dr. Kenel's late January 2005 report does not mention liver cancer. However, the report does reference Mr. Hill's seizures, and his scheduled treatment, beginning on "1/25/04" (sic?) for Hepatitis C.

24. *Hartridge v. United States,* 896 A.2d 198, 207 (D.C.2006) (referencing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

25. "We regard a delay of a year or more to be prima facie evidence of a speedy trial violation, which creates a presumption of prejudice to the defendant." *Hartridge,* 896 A.2d at 208 (citing *Hammond v. United States,* 880 A.2d 1066, 1079 (D.C.2005) (other citations and internal quotation marks omitted)).

26. *Graves v. United States,* 490 A.2d 1086, 1092 (D.C.1984) (en banc).

27. *Johnson v. United States,* 434 A.2d 415, 419 (D.C.1981) (citation omitted).

28. *Barker, supra* note 24, 407 U.S. at 532, 92 S.Ct. 2182.

balance his physical health," and "the pending imposition of punishment that loomed over him throughout the delay," lack the required demonstration of "particularized harm," or "specific impact" on him.[29] Finally, Mr. Hill's assertion that his "ability to gather and present evidence, including witnesses, was impaired by the delay," is unsupported by the record. In his reply brief, he claims that "the lead detective was unavailable after the lengthy delay." Yet, nothing in the record shows that Mr. Hill ever intended to call the lead detective as a witness or that he had issued a subpoena requiring his presence, and despite the trial court's efforts to get him to mark whatever documents he wanted to use at trial, including an audiotape relating to the lead detective, Mr. Hill never presented any documents to the trial court to be marked or reviewed for admissibility into evidence. Under these circumstances we cannot agree with Mr. Hill that the less than one year delay in the trial of his case prejudiced him.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

**29.** *See Turner v. United States,* 622 A.2d 667, 679 (D.C.1993); *Hammond, supra* note 25, 880 A.2d at 1087–88.